Commonwealth *v.* Craft, Appellant.

Argued September 8, 1969. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

478

*James T. Reilly*, with him *Egli, Walter and Reilly*, for appellant.

*George E. Christianson*, Assistant District Attorney, with him *Alvin B. Lewis, Jr.*, District Attorney, for Commonwealth, appellee.

OPINION BY HOFFMAN, J., November 13, 1969:

Appellant in the instant case was convicted of larceny and burglary, arising out of two separate incidents at the Trinity United Church of Christ. The only question presented in this case is whether there was sufficient evidence to convict appellant of the crimes charged.

It is axiomatic that the test of the sufficiency of the evidence is whether accepting as true all the evidence upon which the fact finder could properly have based its verdict, the evidence was sufficient in law to prove beyond a reasonable doubt that the appellant was guilty of the crimes charged. Compare *Commonwealth v. Tabb*, 417 Pa. 13, 207 A. 2d 884 (1965), with *Commonwealth v. Walker*, 428 Pa. 244, 236 A. 2d 765 (1968); *Commonwealth v. Crews*, 429 Pa. 16, 239 A. 2d 350 (1968); *Commonwealth v. Hazlett*, 429 Pa. 476, 240 A. 2d 555 (1968). In reviewing the evidence, the Commonwealth is entitled to all reasonable inferences arising therefrom. Compare *Commonwealth v. Tabb*, supra, with *Commonwealth v. Hazlett*, supra; *Com-*

*monwealth v. Zimmerman,* 214 Pa. Superior Ct. 61, 251 A. 2d 819 **(1969)**.

# I

The first charge involved the larceny of a pocketbook from the church. The facts in that case were as follows:

In March, 1967, one Sarah Hartman was a custodian at the Trinity United Church of Christ in Palmyra. One morning, she was dusting the first floor hallway when appellant appeared at the church's closed front door requesting entrance. There was another door which was open at the time, which appellant did not use. Appellant explained that he was looking for a pair of gloves left by his daughter in the church. Mrs. Hartman admitted him. Appellant entered The Fellowship Hall, presumably to look for the gloves, and Mrs. Hartman resumed her dusting. After some time, Mrs. Hartman was curious as to whether appellant had found the missing gloves. She headed toward one door of Fellowship Hall. At the same time, appellant was leaving the Hall by another door. Then he left the church by the rear door.

Mrs. Hartman admitted she did not see appellant carrying anything as he left. Admittedly, she was a distance up the hallway from where appellant left the church.

Some time later, Mrs. Hartman missed her pocketbook. She had left it on an umbrella rack near the door which appellant had used to leave the church.

She testified that she saw no one else near the umbrella rack that morning. She knew that her husband and her father were in the church, but they were not near the rack. She admitted that a maintenance man had been seen in the church that morning, but she had not seen him.

The pastor of the church testified that there were at least four master keys to the church in circulation. In addition, there were at least four and probably more keys to particular doors of the church in circulation.

In summation, therefore, the Commonwealth's case rested on the testimony of Mrs. Hartman and, in particular, that part in which she said that appellant was the only person near the umbrella rack that morning, to her knowledge. That alone, in view of the other admissions, cannot stand.

Mrs. Hartman was busy dusting. Any number of people could have gained entrance to the church, either by using their own keys or by using the door that was open. It is reasonable to believe there were others in the church whom Mrs. Hartman did not see. Admittedly, she did not see the maintenance man. Moreover, she saw the appellant leave the church, but he was carrying nothing that she could see. Appellant cannot be convicted because he was the only stranger Mrs. Hartman saw near the umbrella rack, under such circumstances. *Commonwealth v. Hazlett,* supra.[1]

## II

The second charge involved the burglary of the church. The facts in that case were as follows:

Monroe Hoffman testified that on June 18, 1967, he had locked each of the church's doors before leaving some time around noon.

---

[1] The Commonwealth notes that the testimony in Part II indicates that appellant had access to the church when it was closed, subsequent to the pocketbook incident. They also note that the missing pocketbook contained a master key to the church. Hence, they argue, appellant's access to the church is added evidence that he may have taken the pocketbook. Mere access alone, however, is not enough to overcome the reasonable doubt still present in

James Rothermel, who lived next to the church, testified that at about 12:10 p.m., he saw Mr. Hoffman leave the church. At about 12:20 p.m., he saw appellant drive into the church's parking lot and park his car. Appellant left his car and then entered the church's rear door. Mr. Rothermel admitted that he saw this occur from a distance of about 85 to 90 yards.

Mr. Rothermel then got his binoculars and continued to observe the church's rear door. Seven to ten minutes after appellant had entered, Mr. Rothermel said he came out. *Admittedly, appellant was carrying at that time nothing more than what might have been a key.*[2] Appellant re-entered his car and drove off.

Mr. Rothermel evidently made no effort to contact the police thereafter. He was not even sufficiently suspicious to remain at home and continue his observations.

Mrs. Rothermel testified to the same facts as her husband, except that she admitted that she had not used the binoculars. Moreover, she said she had not seen appellant's car in the parking lot the rest of the day and evening.

As we mentioned above, Reverend Townsley, the pastor of the church, testified that there were at least four master keys to the church in circulation. In addition, there were at least four and probably more keys to particular doors of the church in circulation.

Reverend Townsley also testified that on June 19, 1967, he, apparently, was the first one into the church in the morning. With respect to his observations concerning the condition of the church office, he testi-

---

this case, in view of the many keys in circulation and the many ways of gaining entrance to a building.

[2] We give little credence to the testimony that appellant may have been carrying a key. From 85 to 90 yards, even with binoculars, it is doubtful that a key could be clearly seen.

fied, in relevant part, as follows: "A. [Reverend Townsley] . . . I went into the office, and there I saw many things amiss. Q. [The District Attorney] Would you describe what you saw missing? A. We have a metal desk for the church' [sic] secretary that works there on a part-time basis, and the drawer to the desk is kept locked, because of the small amounts of petty cash for the postage. The top drawer was bent and pried open, and the petty cash box was on the floor of the office with the lid open, and everything in it scattered about. There was no money there any longer, just the record book which we keep the various expenditures, and the filing cabinet had a record player sitting on it and the filing cabinet was pried open. A box in it, a small metal box was pried open. This contained papers, receipts or cancelled checks, and nothing was taken from that. Then the small work room off of the office, the one (1) locked door in there was pried open. This is the door in which we keep the church record books. We keep no money in there, but it was pried open and bent. . . . The cash in our petty cash box was gone. . . . The record player . . . was gone."

Mrs. Boyd Firestone testified, in relevant part, as follows: "Q. [The District Attorney] And how were you connected with the Trinity United Church of Christ? A. [Mrs. Boyd Firestone] Well, my husband and I are both members of the church. My husband is the financial secretary of the church. Q. Do either you, or your husband have any keys to that church? A. My husband has a key that will open the side door, and the office door. Q. As financial secretary, do you help him in his duties as such? A. Yes, I do. Q. Did you so perform any duties on June 18, 1967, which was a Sunday, at the church? A. Yes, sir. Q. Would you indicate to the Court and the jury what those duties were?

A. On that particular Sunday, . . . Between two-thirty (2:30) and six o'clock (6:00), I went to the church to pick up the envelopes to take to our home. . . . Q. And what did you do, *as far as the office was concerned,* when you left it? A. I re-locked it. It was locked when I arrived. . . . Q. [defense counsel] Did you hear the testimony of Reverend Townsley . . . as far as damages on Monday [June 19, 1967]? A. Yes, sir, I did. Q. *Did you notice any damage at all when you were there?* A. *Nothing at all.* [Emphasis added.]"

In summation, therefore, the Commonwealth's case rested on the evidence that appellant had access to the church and that he entered it once on the day of the burglary. He was not seen carrying away any goods. After he had left, one person noticed that the office had not been disturbed by anyone. The Commonwealth argued, accordingly, that appellant was only "casing" the church in the afternoon and that he came back that evening.

It is reasonable to believe, however, that any number of people could have entered the church in the evening, using one of the many keys in circulation, and burglarized it.[3] We cannot infer, without a reasonable doubt, that because appellant once entered the church, apparently without permission, he did so again during the evening. Appellant cannot be convicted on such evidence. *Commonwealth v. Hazlett,* supra.

Judgment of sentence is reversed and appellant is discharged with respect to all charges.

WRIGHT, P. J., WATKINS and MONTGOMERY, JJ., would affirm the judgment below.

---

[3] We do not even know whether the keys in circulation were still in the possession of those to whom keys were given.